**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-CR-224 (DLF)** |
| **v.** | : | |
| | : | |
| **JOSHUA COLGAN,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Joshua Colgan to 30 days of incarceration, 3 years of probation, 60 hours of community service, and $500 in restitution.

## I.    Introduction

Defendant Joshua Colgan, a 35-year-old flooring installer, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Defendant Colgan pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 30 days of incarceration and three years' probation is appropriate

---

[1] Although the Statement of Offense in this matter, filed on January 26, 2023, (ECF No. 32 at ¶ 5) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

in this case because (1) his inflammatory social media posts both before January 6 included violent rhetoric, including calling for "war" and "chaos," and encouraged others to travel to Washington, D.C.,  and after January 6 spread disinformation about antifa, and reveal a complete lack of remorse; (2) his criminal history spans 16 years and includes jail time for a felony substance abuse conviction and for a trespass; and (3) his conduct while on supervision has been notable for substance abuse and an attempt to reinstate firearms privileges.

The Court must also consider that Colgan's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Colgan's crime support a sentence of 30 days incarceration, 3 years of probation, 60 hours of community service, and $500 in restitution in this case.

In the days and weeks before January 6, Colgan posted multiple social media statements beginning on December 27, 2020, that demonstrate that Colgan planned to come to the Capitol on January 6 ("we're getting our country back, we're going to show the world who's in charge on the 6th"), that he planned for violence ("War needs to happen."), and that he solicited others to travel with him ("got 3 seats open in my pickup from Maine"). Even after the events of January 6, Colgan had another individual post a message for him, on January 7, justifying the violence that had taken place, where he repeated false information about the January 6 riot. Moreover, Colgan deleted his Facebook posts from January 2-9.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions

alongside so many others, the riot likely would have failed. Here, the Colgan's participation in a riot that succeeded in halting the Congressional certification combined with the Colgan's preparation for violence, his celebration and endorsement of the violence on that day, his lack of remorse, and the potential for future violence renders a jail sentence both necessary and appropriate in this case.

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7.

### Colgan's Social Media Posts Before January 6

Prior to January 6, Colgan made multiple statements celebrating violence in preparation for his travel from Maine to Washington, D.C. Colgan made the following statements on Facebook:

December 27, 2020: "we're getting our country back, we're going to show the world who's in charge on the 6th"

December 27, 2020: "5 more seats in the ram"

December 28, 2020: "don't worry, us patriots are taking back what's ours"

December 29, 2020: "got 3 seats open in my pickup from Maine"

December 30, 2020: "it is January 6th were storming the capital by the millions to take back our country"

December 31, 2020: "There for one reason. To help make sure our President doesn't leave his seat"

December 31, 2020: "War needs to happen."

January 2, 2020: "We're storming that mother fucker hard man"

The statements speak for themselves, but they are not the most inflammatory of Colgan's social media statements. The above statements were recovered pursuant to a search warrant of Facebook from July 2021. However, tipsters provided screenshots of a far more incendiary Facebook post, which is among the several posts that were subsequently deleted, presumably by Colgan. It is transcribed below:[2]

> January 5, 2021: Today is the start of the chaos, the start of a revolution, the end of a chapter, [UI] states several million Brothers and Sisters united at our nation's capitol to over throw this corrupt government and to form a new brotherhood of Patriots that will be permanently carved into our history books to never be forgotten. We love our president Donald Trump, his family, everything he's come to [UI] us since day one even while being slandered, cheated and pourded on. his continuous fight for his people to ensure their future has not stopped, its time we return the favor, all That being said, this is deeper now, this is for the children! To ensure every innocent boy and girl in this country DOES NOT, WILL NOT EVER grow up in a socialist nation. "One nation under God indivisible with Liberty and Justice for All". Amen. Let's roll!

Colgan also deleted a Facebook post that showed him walking in what appears to be Washington, D.C. with a flag.

*Colgan's Role in the January 6, 2021 Attack on the Capitol*

On January 6, Colgan entered the Capitol through the Senate Wing Door at approximately 3:22 p.m. By that time, the windows on both sides of that door were broken and police had boarded up one of the windows. Also present was overturned and damaged furniture, and dozens of officers attempting to contain the crowd and directing them to exit. Colgan is visible in Image 1, below, entering, while appearing to make a recording on his mobile phone.

---

[2] The posts are transcribed from grainy screenshots. Where the transcriber could not make out the words, "[UI]" for unintelligible has been inserted. Spelling mistakes are original.



*Image 1* – Colgan enters the Capitol



*Image 2* – Colgan continued to record in the lobby of the Senate Wing Door entrance



*Image 3* – Colgan in the lobby on a third-party video

Although there is no audio in the Closed-Circuit Television (CCTV) videos from the U.S. Capitol, there is in the recording of the livestream video created by the rioter from which Image 3 is taken. A loud, high-pitched alarm was blaring, warning the rioters to leave the building. Colgan eventually exited through the same door he entered at approximately 3:31 p.m.

*Colgan's Social Media Posts After January 6*

On January 7, in spite of an apparent inability to personally on Facebook, Colgan used a friend to promote a lengthy diatribe full of false information insisting the riot was caused by and carried out by antifa, that rioters were peaceful and welcomed by police.

> January 7, 2021: Sharing for my friend Josh Colgan
>> Josh Colgan first off mark Zuckerberg you will be banning me for life after you're commi crew sees i found a way around your weak attempt to stop the truth. Here it is patriots : truth exposed
>> I witnesses with video proof on day one Metro PD and National guard escorting in hundreds of Antifa dropping them off to BLM plaza, giving them protection . Day two, more radicals brought into our capital with protection antifa took time to infiltrate us givin they had orders ot do

Day 3 . After trumps speech, we marched the capitol peacefully
unknowing antifa was leading the march.
I watched metro PD remove the barriers for antifa as we all marched
towards our capital. I zoomed my camera in and captured several radicals
on the roof before we even got close Scaling walls and upon getting to the
top several antifa in the capital, upstairs and down, not one patriot made
entry
Antifa were smashing windows. Given the proper tools needed to breach
the front door and storm the capital and cause major damage, I took video
of the destruction, while hundreds of corrupt metro and capital police
stood by and watched the mayhem they watched THEM destroy our
capital without interference, a simple tear gas could have cleared is out,
but that would ruin the sting. I got close footage of PATRIOTS calmly
walking in the front door fist bumping capital police WELCOMING us in
with kindles ! UTIL the evidence was gathered, at this moment they
flashbanged me and my fellow patriots and let the teargas fly, at this
moment a shot rang off, I was there when ashli babbit was SHOT and
MURDERED in cold blood by the capital police and I'll never unsee the
horror that unfolded. This was the biggest infiltration in American history,
I DEMAND justice for ashli babbit and her family, I will never stop
fighting, the corruption ends now. My deepest sympathy goes out to her
family and I'll make sure they see this as this message will be mass
shared. Good luck in prison Pelosi.
All patriots share the fuck out of this. Much love you all

*Colgan's Voluntary Interview with the FBI*

On August 4, 2021, Colgan gave a voluntary interview to the FBI in which he lied that he

did not enter the Capitol and repeated false information about antifa being responsible for the riot.

Colgan specifically denied entering the U.S. Capitol, though he acknowledged being present on

the Grounds. As shown above and by Colgan's plea agreement and allocution, Colgan's denials

of entering the U.S. Capitol were lies and he showed no remorse.

Colgan began his interview by stating he went down and "had a great time." When asked

if he went inside the Capitol he said, "No. Nope, I was on the front steps." When asked later in the

interview if he ever got "close to the door" or if he was ever near "where the doorway was,"

Colgan said, "No." When asked if he was confident that there was no chance he was inside the

building at all, he again said, "No." When the FBI agent conducting the interview showed a map

of cellular telephone pings that showed Colgan's device inside the Capitol, Colgan said, "I didn't go in there. I was standing outside."

He said he went and met like-minded people and "we had a good time." Colgan acknowledged he was at the former President's speech at the Ellipse. Colgan acknowledged that police were "everywhere" as he walked up to the Capitol. He observed fighting up on the steps. Colgan denied taking any photographs when it was "crazy" while he was "there." Colgan acknowledged that he saw people on the "skyjacker lift," and also repeated false information that he saw "antifa guys smashing the windows out." In discussing his social media, Colgan said that Facebook moderation never deleted any of his posts. Colgan further stated that he believed persons who assaulted police officers were "antifa" and that he personally observed white vans dropping off "antifa" at Black Lives Matter Plaza the day before.

### The Charges and Plea Agreement

On April 29, 2022, the United States charged Colgan by criminal complaint with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On May 2, 2022, law enforcement officers arrested him at his local probation office in Wicasset, Maine. On June 24, 2022, the United States charged Colgan by a 4-count Information with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2)2, 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On January 26, 2023, pursuant to a plea agreement, Colgan pleaded guilty to Count 4 of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.     Statutory Penalties

Colgan now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of the recommended sentence of 30 days incarceration as a condition of 3 years' probation.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Colgan's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Colgan, the absence of violent or destructive acts is not a mitigating factor. Had Colgan engaged in such conduct, he or she would have faced additional criminal charges.

One of the most important factors in Colgan's case is his inflammatory statements on social media both before and after the riot. As discussed above, the posts encouraged violence generally, encouraged violence specifically at the Capitol, and invited others to come with him. Colgan was explicit in that his purpose for going to the Capitol was to "make sure our President doesn't leave his seat," "to overthrow this corrupt government," and even stating, "[w]e're storming that mother fucker hard man." Colgan's inflammatory statements continued through January 6, as discussed above, and after January 6, when another individual posted a message purporting to be on his behalf promoting false information.

Another aggravating factor in Colgan's case is his destruction of some of his social media posts. As discussed in greater detail above, Colgan made a post on January 5 that was captured by a tipster, but was subsequently deleted from his Facebook account, presumably by Colgan. Colgan in fact confirmed during his pre-arrest interview that Facebook moderators had not deleted any of his Facebook messages.

A final aggravating factor is Colgan's lack of remorse in the form of his untruthful statements in his August 4, 2021 interview with the FBI. Besides lying four times to the FBI agents when he denied he went inside the Capitol, Colgan repeated false information about "antifa" committing violence at the Capitol, and emphasized that "we had a good time" on January 6.

The United States acknowledges that Colgan's time in the Capitol was brief and that he did not enter any sensitive spaces. However, those mitigating factors do not justify a sentence lower than the government's recommendation in light of the aggravating factors discussed above, and Colgan's criminal history and compliance with pretrial supervision discussed below.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 30 days incarceration as a condition of 3 years' probation in this matter.

### B.  The History and Characteristics of Colgan

As set forth in the Pretrial Investigation Report ("PSR") (ECF # 38 at ¶¶ 31-38), Colgan's criminal history consists of a myriad of misdemeanor convictions and one felony conviction, beginning with a juvenile conviction in 2005 and continuing through to 2021. In 2010, Colgan was also convicted of a felony count of eluding an officer and operating a motor vehicle under the influence, for which was sentenced to 60 days and 48 hours incarceration respectively. Colgan has multiple convictions involving crimes of mischief: (1) aggravated criminal mischief in 2004 (PSR ¶ 31); (2) a criminal mischief and interference with constitutional rights case for which he was incarcerated for 10 days in 2006 (PSR ¶ 32) (3) a criminal mischief case in 2010 for which he was confined for 48 hours (PSR ¶ 33); and (4) a criminal mischief case in 2017 (PSR ¶ 36). Significantly, Colgan has had a recent trespass and harassment case for which he served 30 days in jail in 2015 (PSR ¶ 35), a crime demonstrating his direct knowledge of the law against trespass. Additionally, he was convicted of a domestic assault in 2020 (PSR ¶ 37), and post-January 6, of operating a watercraft under the influence in 2021.

While on pre-trial supervision, Colgan has failed to fully comply with the conditions of his pretrial release. As discussed at numerous hearings and most recently at the revocation hearing of March 8, 2023 (and in the PSR at ¶¶ 59-61), Colgan has continued using controlled substances. Moreover, Colgan continues, as recently as March 15, 2023 (Pretrial Services Report, ECF #36 at 3) continued to test positively for marijuana and now alcohol.

Additionally, Colgan, through counsel, negotiated conditions of release with the Magistrate Court in May 2022 to permit him to possess a compression bow for hunting as an exception to the standard no-weapons condition (ECF # 8, §§ k and t). But despite having negotiated this carve-out, as discussed at the Status Hearing of November 18, 2022, Colgan applied to the Main State

Police to reinstate his gun privileges in the State of Maine without notifying or involving this Court. While the Government acknowledges the distinction between having the privilege to possess a firearm and actually possessing a firearm, applying for reinstatement of firearm privileges without going through this Court demonstrates again that Colgan has failed to comply with conditions of release. Although Colgan, through counsel, at the revocation hearing acknowledged that he would stop pursuing reinstatement of his firearms privileges in the State of Maine, the steps he took violated a pretrial condition specifically imposed by this Court. The United States respectfully submits that Colgan's incomplete pretrial compliance weighs against a sentence of merely longer supervision.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.   The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37). General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Prior and during his time in Washington, Colgan posted explicitly violent posts on Facebook, and encouraged others to join him to storm the Capitol. Colgan entered the Capitol through the Senate Wing Doors, with broken windows on each side of the door, a loud alarm blaring, and numerous police officers in the room. Colgan's lack of remorse, and his false statements to the FBI, make clear that he presents a risk of repeating this conduct in the future if he is faced with a political outcome he does not like or a political victory he does not support. Colgan's lengthy criminal history with his 2015 trespass conviction, his complete lack of remorse for his conduct as demonstrated by his FBI interview, and his inconsistent compliance with pretrial supervision in this case, demonstrates the need for incarceration.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Colgan based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Colgan has pleaded guilty to Count 4 of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply,

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted.  *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in

the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented

that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject

to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those

cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases

as the closest "comparators" when assessing unwarranted disparity. But nothing in Section

3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases,

even those involving similar criminal conduct and defendant's records. After all, the goal of

minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several

factors that must be weighted and balanced," and the degree of weight is "firmly committed to the

discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).

The "open-ended" nature of the Section 3553(a) factors means that "different district courts may

have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a)

factors differently; and every sentencing decision involves its own set of facts and circumstances

regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C.

Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the

Sentencing Guidelines range, differently from the sentence an appellate court might have imposed,

and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

It follows that a sentencing court in a Capitol siege petty offense case is not constrained by

sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272

(TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the

sentencings that have been handed out by my colleagues. And as your attorney has pointed out,

you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Some previously sentenced defendants have similarly made inflammatory social media posts and statements, deleted incriminating social media posts, spread false information through social media, lied to the FBI to minimize their involvement to show no remorse, and have significant criminal history, have pled to 40 U.S.C. § 5104(e)(2)(G), and have received a sentence of home detention with probation. *See United States v. Bennett*, 21-cr-227-JEB, ECF #24 (sentenced to 24 months' probation, 3 months home detention), *United States v. Griffith*, 21-cr-204-BAH, ECF #92 (sentenced to 36 months' probation, 90 days home detention).

For instance, Jackson Kostolosky was a rioter who, like Colgan, communicated with others that he did not have remorse after January 6, denied entering the Capitol when talking to the FBI, and deleted evidence. *United States v. Kostolsky*, 21-cr-197-DLF, ECF #41 at 1-2. Kostolsky pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in a Capitol Building) and this Court sentenced Kostolsky to 30 days home detention and 36 months of probation.

In *United States v. Panayiotou*, 22-cr-55 (DLF), the defendant entered the Capitol approximately 10 minutes after it was breached. At one point, Panayiotou was stopped by multiple armed law enforcement officers. Here, Colgan entered with alarms sounding and the presence of numerous police officers attempting to get rioters to leave. Similarly to Colgan, Panayiotou violated the conditions of his release by testing positive for marijuana three times, once after judicial admonishment. And like Colgan, Panayiotou failed to show remorse for his activities. Like Colgan, he pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G). This Court sentenced Panayiotou

to 14 days' intermittent confinement, as a condition of 36 months' probation. The Court also imposed a $1,500 fine and $500 restitution.

In *United States v. Matthew Webler,* 21-cr-741 (DLF), the defendant traveled past unmistakable signs of violence and entered the Capitol. Inside the Capitol, he cheered and celebrated the breach, singing "Happy birthday to me," and, when exiting, shouted to his fellow rioters, "Woo, 1776." Colgan, similarly, told the FBI that "we had a great time." Like Webler, Colgan used social media to promote and endorse violence. Like Webler, Colgan pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G). Colgan has 8 prior convictions. Based on Webler's criminal conduct and criminal history (11 prior convictions), this Court sentenced Webler to 45 days' incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[4]

---

[4] Although other judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal

## V.      Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Joshua Colgan to 30 days of incarceration, 3 years of probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

---

petty offenses, this Court has rejected that view. *See United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).See, e.g., 18 U.S.C. § 3561(a)(3).

On the other hand, this Court and others have concluded that it has authority to impose a term of incarceration as a condition of probation under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. *See Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)). The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

By:     /s/ Jeffrey A. Kiok
        JEFFREY A. KIOK
        Attorney (detailed)
        N.Y. Bar Number 5400221
        United States Attorney's Office
        601 D Street, N.W.
        Washington, D.C.  20530
        Telephone: (202) 307-5967
        Email: jeffrey.kiok2@usdoj.gov